2021 IL App (1st) 191377-U

SIXTH DIVISION
December 17, 2021

No. 1-19-1377

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 9946 |
| | ) | |
| RIGOBERTO SANTILLAN, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Harris concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Defendant's convictions for criminal sexual assault and aggravated criminal sexual abuse are affirmed where defendant failed to demonstrate that (1) the State's evidence was insufficient to establish his guilt beyond a reasonable doubt, (2) the trial court erred in allowing the admission of an outcry hearsay statement, and (3) the State's indictment alleging aggravated criminal sexual abuse during a six-year period was unconstitutionally overbroad.

¶ 2    The State charged defendant Rigoberto Santillan with sex offenses against D.R. and M.R., the minor daughters of his long-term girlfriend. Following a bench trial, Mr. Santillan was found guilty on three counts involving D.R. and received an aggregate sentence of 10 years in prison—

seven years on one count of criminal sexual assault and three years on two counts of aggravated criminal sexual abuse. The court found him not guilty on all counts involving M.R.

¶ 3    On appeal, Mr. Santillan argues that (1) the evidence presented was insufficient to establish his guilt beyond a reasonable doubt for any of the three crimes of which he was convicted, (2) it was plain error for the trial court to allow the introduction of an outcry hearsay statement uttered by D.R. because the statement lacked sufficient safeguards of reliability, and (3) his two convictions for aggravated criminal sexual abuse should be reversed because the charging instrument, which alleged that those offenses were committed over a period of six years, was unconstitutionally overbroad.

¶ 4    For the following reasons, we affirm.

¶ 5                              I. BACKGROUND

¶ 6                              A. The Indictment

¶ 7    On June 24, 2015, Mr. Santillan was charged by indictment with 18 sex offenses committed against D.R., the daughter of his live-in girlfriend, Margarita Anaya. He was charged with 1 count of predatory criminal sexual assault of a child (count 1), 1 count of criminal sexual assault (count 2), and 16 counts of aggravated criminal sexual abuse (counts 3-18).

¶ 8    Count 1 alleged that Mr. Santillan knowingly committed an act of sexual penetration upon D.R., then under 13 years of age, by inserting his finger into her sex organ "on or about August 22, 2005 and continuing on through August 21, 2009." Count 2 alleged that "on or about August 22, 2009 and continuing on through August 21, 2011," Mr. Santillan knowingly committed an act of sexual penetration upon D.R. by making contact with D.R.'s sex organ with his mouth and that at the time the act was committed, D.R. was under 18 years of age. The remaining 16 counts alleged various other instances of sexual abuse where, "for the purpose of sexual gratification,"

Mr. Santillan had either "touched his hand to D.R.'s breast," "touched his mouth to D.R.'s breast," "touched his hand to D.R.'s sex organ," or "touched his hand to D.R.'s buttock." These 16 incidents allegedly occurred between August 22, 2005, and August 21, 2009.

¶ 9    Mr. Santillan did not move for a bill of particulars or object to the specificity in the indictment prior to trial.

¶ 10                                B. Pretrial Hearing

¶ 11    Leading up to Mr. Santillan's trial, the State moved for the admission of two hearsay statements uttered by D.R. between August 22, 2007, and August 21, 2008, when she was 11 years old. One of these statements was purportedly made to her maternal grandmother, Epifania Anaya, and the other to her childhood friend, Maria Gomez. On January 22, 2019, the trial court held a hearing on the motion to determine whether, pursuant to section 115-10 of the Code of Criminal Procedure (725 ILCS 5/115-10 (West 2018)), "sufficient safeguards of reliability" existed to allow for the admission of these statements.

¶ 12    At the hearing, Epifania, testifying through a Spanish interpreter, stated that she was raised in Mexico but had lived in the United States for many years and that she moved around, living for periods of time with each of her children. She had trouble recollecting her age, but when prompted agreed that she was 73 years old. Epifania could not remember if she was living with her daughter Margarita Anaya (D.R.'s mother) and Mr. Santillan between August 2007 and August 2008. When asked if she lived with them when D.R. was 11 or 12 years old, Epifania stated: "Yes, I did live there but nothing happened."

¶ 13    Epifania further testified that D.R. never told her anything about Mr. Santillan removing her underwear or touching her vagina or that Mr. Santillan had threatened "to hurt the family" or "make the whole family disappear" if she told anyone what he had done to her. When asked if

D.R. ever told her that Mr. Santillan liked to pick her up from school before Oscar "so he could do what he wanted with her," Epifania retorted: "Why should I make false statements and lie to you. She did not tell me anything." The court, recognizing that it could not find Epifania's testimony as to D.R.'s out-of-court statements to be reliable where Epifania was denying that these statements had even been made, denied the State's motion as to Epifania's testimony.

¶ 14 The State was more successful with the other statement it sought to introduce. Maria Gomez, who was 22 years old at the time of the hearing, testified at the hearing that she and D.R. had been friends since they were in kindergarten and first grade, respectively. Maria testified that sometime between August 22, 2007, and August 21, 2008, she spent the night at D.R.'s house. D.R. shared a room at that time with her older sister, M.R., who slept on the top bunk. Maria and D.R. shared the bottom bunk, with D.R. sleeping closest to the wall and Maria sleeping toward the edge of the bed. That night, as Maria slept next to her friend, she woke to find Mr. Santillan tapping her on the shoulder and calling D.R.'s name. When she turned to face him and he saw that she was not D.R., he "left right away" without saying anything. Maria was uncomfortable and wondered why D.R.'s stepfather would come looking for her in the middle of the night. She told D.R. what had happened but did not tell her parents. She did not spend the night at D.R.'s house ever again.

¶ 15 Maria also testified that sometime during that same year, when the two were sitting on the steps outside D.R.'s house, D.R. looked sad. Maria stated: "I asked her what was going on, and she told me the whole truth," that "her step dad would touch her inappropriate [*sic*]." When asked to relay the exact words D.R. had used in that conversation on her doorstep, Maria said: "He would touch her in her private parts. Those were the words she told me." Maria also testified that D.R. used the word "inappropriate" to describe Mr. Santillan's behavior. The trial court found sufficient indicia of reliability to allow testimony regarding the outcry statement made to Maria.

¶ 16                                    C. The Trial

¶ 17    The bench trial was on April 3, 2019. Witnesses agreed that D.R., her older sister M.R., their younger half-brother Oscar, their mother Margarita, and Mr. Santillan had all lived together in the same two-bedroom home on Chicago's west side for a period of about 10 years. M.R. was approximately four years older than D.R. and D.R. was four years older than Oscar. Sleeping arrangements varied. D.R. and M.R. shared a room with bunk beds. M.R. generally slept on the top bunk and D.R. on the bottom bunk, which she shared with her grandmother, Epifania, while Oscar slept in the bedroom shared by Margarita and Mr. Santillan.

¶ 18    Mr. Santillan worked as a truck driver and was often away from home. When he was not working, he would pick his adopted daughter Ana up and bring her to the house to stay with the family. When Ana was staying at the house, she would share the bottom bunk with D.R. and Epifania would sleep on the couch. Margarita often worked night shifts, leaving the house around 10 pm and not returning until the following morning. When Margarita was out working late, D.R. or M.R. would sometimes sleep in Margarita's room with Oscar so he would not be alone.

¶ 19                                   1. D.R.'s Testimony

¶ 20    D.R., who was 22 years old at the time of trial, testified that when she was about nine years old, Margarita was out working late one night so she slept in her mother's bedroom with her little brother Oscar, who was five years old at the time. At some point, as the two children slept, Mr. Santillan came home from a wedding party, entered the room, and took off his clothes. He then got in the bed, pulled D.R. toward him and began rubbing her breasts and vagina over her clothing. D.R.'s sister, M.R., and grandmother Epifania were asleep in the other bedroom. When it was over, D.R., confused and scared, did not immediately get up to tell them what had happened. D.R. testified that the next morning, however, she told her mother about what Mr. Santillan had done to

her. She remembered M.R. being present during the conversation. Margarita's response was to make light of the incident, saying: "he was probably confusing you with me." D.R. did not tell her mother about subsequent incidents of abuse by Mr. Santillan.

¶ 21    D.R. further testified that on another occasion a few years later, when she was 11 or 12 years old, Mr. Santillan called her into her mother's bedroom and asked her to pull down her pants. When she did not comply, he did it for her and began touching her with his hands, inserting his fingers into her vagina. He also lifted her bra to touch her bare breasts. This went on for ten minutes or more. He did not threaten her but kept telling her to relax. D.R. said she did not look at Mr. Santillan but stared at the wall. She was scared and did not know what to do. Later that day, she told her grandmother, the only other person in the house, about what Mr. Santillan had done to her in the bedroom. Crying, she asked her grandmother not to tell anyone else because she was scared.

¶ 22    D.R. went on to describe other incidents of Mr. Santillan's abuse. She explained that between the ages of 11 and 15, Mr. Santillan grabbed her breasts over her clothes more than 30 times. He would reach under her shirt to touch her bare breasts just as often.

¶ 23    On another occasion, when she was 11 or 12, Mr. Santillan called her out to the front porch of the house. Her mother was out of the house working at the time and her siblings were sleeping. On the porch, Mr. Santillan made her sit on his lap. Then he lifted up her shirt and bra and licked her nipples.

¶ 24    She further testified that one day, when she was about 12 or 13, she accompanied Mr. Santillan in her mother's minivan to pick her brother Oscar up from school. On the way to the school, Mr. Santillan drove into the parking lot of a Sam's Club and told her to join him in the back of the vehicle. He then instructed her to pull down her pants after which he put his mouth on her vagina and licked "right in the lips by [her] vagina by the clitoris," again telling D.R. repeatedly

to relax. "[T]his is how sex is" he told her. D.R. testified: "I was scared. I was just so scared."

¶ 25    D.R. additionally testified that beginning when she was about 10, Mr. Santillan would squeeze her buttocks when she walked past him and make a "honking" noise. He often did this in the presence of Margarita, who would not say anything. Sometimes M.R. or Epifania were also present to witness these "honking" incidents.

¶ 26    In addition to telling her mother about the first incident and her grandmother about the second, D.R. recalled telling her childhood friend Maria Gomez that Mr. Santillan "touched [her] breast and [her] vagina."

¶ 27                    2. Corroboration for D.R.'s Account

¶ 28    D.R.'s account was partially corroborated by the testimony of both Epifania and Maria.

¶ 29                    a. Epifania's Testimony

¶ 30    When Epifania was asked if she had previously told the court "the entire truth as [she] knew it" at the section 115 hearing, she said "No, I lied." When asked what she had lied about, Epifania said that in truth, she did recall D.R. coming to her in tears one day after an encounter with Mr. Santillan. "[Mr. Santillan] had put his hand on [D.R.] down there and that he came out of the room and he was laughing," Epifania explained. She recalled sitting in the kitchen watching television or looking out the window when D.R. came out of the bedroom crying. Mr. Santillan followed D.R. from the bedroom to the bathroom and then he left the house without saying anything. When Epifania approached D.R., D.R. was shaking and crying, and she asked D.R. what was wrong.

¶ 31    Based on its prior ruling at the section 115 hearing, the court sustained defense counsel's objections to the State's questions regarding the content of that conversation. Epifania was permitted to testify, however, that D.R. had asked her not to tell Margarita what D.R. had told her

because D.R. was afraid Margarita "might do something to her or to [Epifania] or to [Mr. Santillan]."

¶ 32    When asked why she had lied at the pretrial hearing, Epifania stated: "I was covering for my daughter." She explained that Margarita, who rode with her in the same car to that first hearing, had told her "that if they were going to send [Mr. Santillan] to prison they would also send her to prison." On cross-examination, however, Epifania agreed with Mr. Santillan's attorney that she had told her son Epifanio that her testimony at the section 115 hearing was truthful.

¶ 33                                  b. Maria's Testimony

¶ 34    Maria Gomez's testimony at trial was generally consistent with the testimony she gave at the section 115 hearing. She and D.R. had been childhood friends. One night, during a sleepover at D.R.'s house, Maria woke up to find Mr. Santillan tapping her on the shoulder and saying D.R.'s name. When he saw that it was not D.R., he laughed. Maria said that she told D.R. about this "right away," that it made her feel "really uncomfortable," and that she never spent another night at D.R.'s house again after that.

¶ 35    Maria then described sitting with D.R., sometime during the year that D.R. was 11, on the steps outside D.R.'s house and noticing that D.R. looked sad. Maria asked her what was wrong and D.R. "told [her] the truth of what happened, what her step dad did to her," that "[h]e touched her on her private part." When asked what she meant by "private part," Maria said "[i]n the vagina." When asked why she did not immediately tell an adult about that conversation, Maria said: "Because I was young. I didn't know what to do."

¶ 36    On cross-examination, Maria acknowledged that she considered D.R. to be not just a friend, but family. Maria's brother Angel Gomez was married to D.R.'s sister M.R., and D.R. was herself in a relationship with Maria's older brother. Maria maintained that she had told the detectives in

this case everything she knew. They typed out a statement for her to sign and she signed it without making any changes. Maria agreed that the signed statement did not contain the word "vagina," but insisted that D.R. did use that word in describing where Mr. Santillan had touched her. Maria agreed that she did not ever personally witness Mr. Santillan touch D.R. inappropriately or hear him say anything sexual to her.

¶ 37                                    3. M.R.'s Testimony

¶ 38    D.R.'s older sister, M.R., also accused Mr. Santillan of molesting her and testified at the bench trial regarding those allegations as well as those involving her sister.

¶ 39    Twenty-six years old at the time of trial, M.R. recounted how one night when she was 12 years old and Mr. Santillan was dropping their mother off at work, she and D.R. decided to watch a movie. The tape they inserted in the family's VCR turned out to be a pornographic video. M.R. knew they should not be watching it and was trying to take the tape out of the VCR when Mr. Santillan arrived home and began knocking on the living room window. D.R. went to let him in while M.R. hid the tape in her room and pretended to be asleep. Mr. Santillan then entered M.R.'s room, grabbed her by the arm and brought her to the living room, where he made her watch some more of the tape. He then opened her legs and began to touch her vagina over her clothing, rubbing her thighs and telling her to relax. She repeatedly told him to stop but he did not. M.R. testified that she was "crying and crying" and "kept begging him to stop," but that Mr. Santillan just told her "to relax, that he [was] my dad, he [was] supposed to show me these things and I [was] not supposed to tell anybody."

¶ 40    M.R. further testified that on another occasion, when she was 15 years old, her mother asked her to sleep in her bedroom with Oscar because Oscar was scared. In the morning, Mr. Santillan came into the room, got into the bed where she and Oscar were sleeping, and began

touching M.R.'s vagina and breasts over her clothing, moaning. When she rolled away from him hoping that he would stop, he unhooked her bra and, over her protestations, began rubbing her nipple. Oscar slept through the incident and D.R. was asleep in the other bedroom with their grandmother. M.R. testified that after this second incident she told her mother that same day what had happened and her mother accused her of lying, insisting that it was not true.

¶ 41 M.R. recalled a third time when she was in her mother's room and Mr. Santillan began rubbing her back and her buttocks. She told him to stop, to get off her, and Mr. Santillan responded: "your mom is never going to believe you. Your mom eats from here," pointing to the palm of his hand.

¶ 42 While she only recalled one occasion where Mr. Santillan touched her bare breasts, M.R. testified that he touched her breasts over her clothing "plenty of times," more than 20 in her estimation, when she was between the ages of 15 and 18. Echoing her sister's testimony, she explained that he would come up to her and "honk" her breasts, even in the presence of D.R., their mother, and their grandmother.

¶ 43 M.R. further testified that when her mother refused to believe her, she reported Mr. Santillan's abuse to a friend at school. According to M.R., this resulted in a male investigator from the Department of Children & Family Services (DCFS) coming to the family's home. M.R. told the investigator what had happened to her, and Mr. Santillan was placed on "supervision" for two weeks before the file was closed. M.R. also insisted that Oscar, D.R., Margarita, and Epifania, had all witnessed Mr. Santillan touch her inappropriately. She claimed that this had happened perhaps 100 times. Oscar and Margarita both acknowledged that DCFS had paid the family a visit but insisted that it had nothing to do with allegations of sexual abuse. No documentary evidence was produced at trial clarifying DCFS's involvement in this case.

¶ 44 On cross-examination, M.R. explained that one time, when she got a tattoo without permission, she got into an argument with Margarita, who hit her and pulled her hair, prompting M.R. to call the police. M.R. agreed that when the police arrived, she did not take the opportunity to tell them that she was being sexually abused. She could not remember what year this incident occurred.

¶ 45 M.R. moved out of the house in 2010, on her 18th birthday.

¶ 46                               4. Conversation with Juan Mendoza

¶ 47 Sometime in 2011 or 2012, Margarita invited some aunts, uncles, and cousins over to the house. M.R. agreed that at that event, she had a conversation with her godfather, Juan Mendoza, about why she had decided to move out. Juan asked if Mr. Santillan had ever hit her, and she said no. When he asked if Mr. Santillan ever touched her inappropriately, M.R. said: "I stood quiet. I started crying. I looked over to my mom and I told her you know why I left. You know exactly why I left. Do you want me to tell them why I left. That's what I said. That was my response." M.R. did not remember if D.R. was present when she made these statements.

¶ 48 Margarita had a different recollection of this event. She testified that she invited her family members over on this occasion "to let them know what was happening with [M.R.]." Margarita's sister and brother-in-law began questioning M.R. about her behavior and finally asked her, "is it that Rigoberto is bothering you, did he say something, or what?" According to Margarita, M.R. said "no," that she was just "fed up with [Margarita and Mr. Santillan] because [they] didn't want to give her the freedom that she wanted."

¶ 49 Juan Mendoza, a defense witness, also testified to what he recalled of his conversation with M.R. He remembered questioning M.R. at the family reunion, asking her, "did you have problems with Rigoberto? Did he bother you? Did he touch you? Did he do something to you?" According

to him, M.R.'s response was "no." Juan then explained that he had known Mr. Santillan for 17 or 18 years and he had never seen him touch or speak to the girls inappropriately. He also testified that the girls had never reported any inappropriate behavior to him.

¶ 50                                  5. Angel Gomez's Testimony

¶ 51    M.R. moved back into the family home sometime in 2013, this time with her husband, Angel Gomez (Maria Gomez's brother), and they lived there for about a year. On the stand, Angel recalled some inappropriate comments he witnessed Mr. Santillan make that summer when they lived under the same roof. While he never directly witnessed Mr. Santillan physically touch either of the sisters, on one occasion, the family was eating dinner when a commercial came on the television showing a woman jogging and Mr. Santillan remarked that M.R. and D.R.'s breasts were not perky like the woman's but "were sagging down." Disquieted, Angel made eye contact with Margarita, who made light of the comment, saying "that's how he talks" and "that's how he plays around with them." Sometime later that summer, at another family meal, Mr. Santillan found a hair in his food and speculated aloud who was "more harrier [*sic*] down there," D.R. or his adopted daughter Ana.

¶ 52    Ana, Oscar, and Margarita all denied hearing Mr. Santillan make these comments.

¶ 53                                  6. The Sisters Tell Oscar

¶ 54    M.R. testified that she first learned her sister was also being abused by Mr. Santillan on D.R.'s 18th birthday. Oscar recalled looking for his sisters during the birthday party and finding them "hugging each other and crying." They told him that "a man was hurting them." When he asked who, M.R. revealed that it was his father. Oscar did not report this to their mother because he did not believe what M.R. had told him. It "just didn't sound like my father," he explained, and he knew his sister "would always cry for every little thing."

¶ 55                    7. Angel Calls the Police

¶ 56    The witnesses generally agreed that M.R. and D.R. were watching home movies with their mother on January 15, 2015, reminiscing about their deceased brother Mario, when M.R. directly confronted Margarita about Mr. Santillan's abuse. D.R. testified that M.R. burst into tears and asked their mother how she could "have a man like that who had touched us" in their home. M.R. testified that she told her mother "do you remember when I told you about Rigoberto" and, when M.R.'s mother acted like she did not know what M.R. was referring to, M.R. said, "[d]on't act like you don't know. Remember that he touched me." Margarita then asked D.R. if what M.R. was saying was true and D.R. told her that it was. According to M.R., however, Margarita still refused to believe them.

¶ 57    Oscar, who was with friends that day, testified that M.R. called him on the phone and said, "come to the house," because "[w]e are finally going to tell mom everything."

¶ 58    M.R.'s husband Angel Gomez was already there. He testified that D.R. and M.R. started talking about "what they had gone through with their stepfather" and M.R. became "really emotional. She was crying. She couldn't believe her sister had gone through the same thing." D.R. was crying too, and Angel himself recalled becoming upset. He testified that he was "really mad" and at first "tried to look for [Mr. Santillan]" but that ultimately he "did the right thing and [ ] called the cops." Angel was present when D.R. and M.R. reported their abuse to the police.

¶ 59                    8. Family Members Refute the Girls' Testimony

¶ 60    Aside from the Gomez siblings and the inconsistent testimony from their grandmother Epifania, M.R. and D.R.'s family members generally refuted their testimony and claims of abuse.

¶ 61    Their mother Margarita testified that she never saw Mr. Santillan touch her daughters sexually and insisted that they never told her that he did until that day in January 2015, when they

had the conversation that caused Angel to call the police. She agreed that when D.R. and Maria Gomez were children, Maria came over to their house often, sometimes two to three times a week, and would sometimes stay as late as 11 pm. Margarita insisted, however, that Maria never stayed the night. She lived two blocks away and would walk home by herself or, if it was late, Margarita would walk with her.

¶ 62 On cross-examination, Margarita acknowledged that Mr. Santillan supported her and her children financially. Although they were not married, she thought of him as her husband. When asked whether she "believed that he never touched [her daughters] inappropriately," Margarita responded: "I cannot say something that I don't know whether it's true" but clarified that she "never saw something."

¶ 63 M.R. and D.R.'s younger half-brother Oscar was 18 years old at the time of trial and living with Margarita. Oscar testified that he had a good relationship with his father and that his father supported him financially. Oscar claimed he had never seen Mr. Santillan drink, had never seen him watch pornography, and had never seen him walk into the bedroom naked or do anything inappropriate to his sisters, including grabbing their breasts. Oscar claimed that he could not recall a single occasion when his father was alone with either of his sisters. He also described himself as a light sleeper who was always awakened easily by small noises. He was certain that no one had ever accompanied Mr. Santillan to pick him and Ana up from school. And although Oscar remembered D.R.'s friend Maria coming over to the house less frequently after a certain point in time, he thought that was because Maria broke D.R.'s phone and Margarita had insisted that Maria pay for it. Oscar testified that he had no memories of Maria ever spending the night at their house. Oscar also described M.R. as manipulative and rebellious growing up. She would do things like sneak out of the house and get tattoos, then ask Oscar to cover for her. Oscar said that M.R. would

go to Mr. Santillan and call him "daddy" but "[o]nly when she wanted something," and that she treated their grandmother, Epifania, the same way.

¶ 64    Ana Santillan Ramirez, who was 22 years old at the time of trial, testified that she was Mr. Santillan's adopted daughter and that she had a good relationship with him. Between 2004 and 2011, he would regularly pick her up and take her to stay with him at the house where he lived with Margarita and the other children. She stayed there whenever he was home—a few times a month—and she slept with D.R. and M.R. in their bedroom. She would share a bunk with one of them and the other would sleep alone or sometimes share a bunk with Oscar. Mr. Santillan would pick Ana and Oscar up from their school. Ana testified that she got along well with D.R. and M.R. but that she had been the one to tell her father about M.R. secretly getting a tattoo. Her father then passed this information to Margarita, causing the fight described by M.R. in her testimony.

¶ 65    The girls' uncle, Epifanio Anaya, testified that after his mother Epifania testified at the section 115 hearing, he asked her, "mom, tell me the truth. Is it true that Rigoberto touched them?" and Epifania said to him, "no, it's not true," and that her granddaughter had told her to lie.

¶ 66                    D. The Court's Credibility Determinations

¶ 67    The trial court observed that when serving as the trier of fact its role is to "pay attention to what the witnesses are saying, how they are saying it, their demeanor in court," and "the reasonableness of their testimony in light of all the evidence in the case." The court noted that it had "some issues" with M.R.'s testimony due to a lack of corroboration for her version of events and the fact that she was "somewhat" impeached. Overall, the court found M.R.'s testimony was "not *** that persuasive or credible or clear." The court "did not have those difficulties," however, "with [D.R.]'s testimony," and noted that defense counsel's cross-examination of D.R. had "never brought out any sort of impeachment."

¶ 68    Based on D.R.'s overall demeanor, including the way she fought to hold back tears and how she looked at Mr. Santillan at trial, the court found that her testimony had been clear and credible. Acknowledging that D.R. could not provide specifics regarding all the incidents that were alleged, the court concluded that this was "understandable based on the time frame." For at least some of the alleged encounters, however, D.R. was able to provide specifics regarding what Mr. Santillan had said and done to her, the circumstances of their encounters, and how she had felt and reacted in the moment. The court also found it reasonable that D.R. never went to her mother again after her mother failed to take an early encounter with Mr. Santillan seriously.

¶ 69    The court likewise found D.R.'s testimony regarding her outcry statement to Maria to be credible, regardless of the attempted impeachment regarding the precise words used, which the court "didn't find *** at all significant." The court noted that Maria herself was also "pretty clear and credible" and that no evidence had been presented of any motivation Maria had to lie.

¶ 70    The court considered the testimony of other witnesses at trial to be much less believable or relevant. It observed that Margarita, the girls' mother, "basically testified to nothing, that she [knew] nothing and she was never told about anything," and the court "just [did not] find that credible." The court noted that it was "not able to even see [Margarita's] face a lot of times because she turned away" while testifying.

¶ 71    The testimony of Epifania, the girls' grandmother, was, in the court's view, "[j]ust very unclear and not really reasonable testimony or testimony that presented any real evidence to [the court] one way or another." Mr. Santillan's adopted daughter Ana at most established a possible motive M.R. may have had to make false accusations against Mr. Santillan. And Oscar's testimony that he never saw anything happen was not contradictory or impeaching of D.R.

¶ 72                                    E. The Court's Findings

¶ 73   The court found Mr. Santillan not guilty on all charges relating to M.R., based on "some impeachment there and the problem with her testimony and the lack of corroboration of her testimony." The court then went through each of the counts against Mr. Santillan relating to D.R.

¶ 74   On count 1, the court found Mr. Santillan not guilty. The court acknowledged that D.R. had testified that Mr. Santillan inserted a finger into her vagina but felt that this was "kind of a blanket statement" lacking "any detail or specifics."

¶ 75   On count 2, for criminal sexual assault based on contact between Mr. Santillan's mouth and D.R.'s sex organ between August 22, 2009, and August 22, 2011, the court found Mr. Santillan guilty. The court noted that D.R. had recounted a specific incident that took place in her mother's minivan and the court "believed [D.R.] when she testified to that incident."

¶ 76   On counts 3 and 7, for aggravated criminal sexual abuse based on Mr. Santillan touching his hand and mouth, respectively, to D.R.'s breast for sexual gratification between August 22, 2005, and August 21, 2011, the court found Mr. Santillan guilty "based on [D.R.'s] testimony," corroboration by Maria, and "[D.R.'s] credibility in court." The court also concluded that, as charged, counts 11 and 15 merged into counts 3 and 7.

¶ 77   On counts 10 and 18, for aggravated criminal sexual abuse based on Mr. Santillan touching his hand to D.R.'s buttock for the purpose of sexual gratification between August 22, 2005, and August 21, 2009, the court found Mr. Santillan not guilty based on "the lack of specificity and time frame" and the fact that it "really didn't hear any evidence of that." Without further explanation, the court also found Mr. Santillan not guilty on all the remaining counts.

¶ 78   The trial court denied Mr. Santillan's motion for a new trial, reiterating that it had "found [D.R.]'s testimony to be credible." The court disagreed with defense counsel that D.R. had been impeached. The court also noted that D.R. had made several attempts to tell others what happened

to her, acknowledging that while these outcries were not immediate, the delay was not surprising "based on the circumstances of what [the court] found [Mr. Santillan] guilty of."

¶ 79    The court then sentenced Mr. Santillan to seven years in prison for criminal sexual assault (count 2), to be served consecutively to two concurrent three-year terms for aggravated criminal sexual abuse (counts 3 and 7). Mr. Santillan now appeals.

¶ 80                                II. JURISDICTION

¶ 81    The trial court sentenced Mr. Santillan on June 18, 2019, and he timely filed a notice of appeal from the judgment against him that same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 82                                III. ANALYSIS

¶ 83    On appeal, Mr. Santillan raises three arguments: (1) the evidence was insufficient to establish his guilt beyond a reasonable doubt for any of the three crimes of which he was convicted, (2) it was plain error for the trial court to permit the admission of the outcry hearsay statement made by D.R. to Maria Gomez because the statement lacked sufficient safeguards of reliability, and (3) his convictions for the two counts of aggravated criminal sexual abuse should be reversed because the charging instrument was unconstitutionally overbroad. We address each argument in turn.

¶ 84                          A. Sufficiency of the Evidence

¶ 85    Mr. Santillan first argues that that the only evidence of his guilt in this case was D.R.'s testimony and that, "standing alone," this testimony—which he characterizes as uncorroborated and impeached—was "simply insufficient" to support his convictions.

¶ 86    In addressing Mr. Santillan's sufficiency claim, the role of this court is not to retry him. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A criminal conviction will only be reversed under this standard "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 87    Testimony from a single witness, "if it is positive and the witness is credible," is sufficient to support a conviction. *People v. Smith*, 185 Ill.2d 532, 541 (1999). Where, as here, a conviction rests largely on the credibility of witness testimony, we give great deference to the fact finder and reverse only where the witness's testimony is so "fraught with inconsistencies and contradictions" and "so lacking in credibility that a reasonable doubt of [the] defendant's guilt remains." *People v. Schott*, 145 Ill. 2d 188, 207 (1991). To warrant reversal, the fact finder's determination of the witness's credibility must be "improbable, unconvincing, and contrary to human experience." *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992).

¶ 88    The trial court's determination that D.R. was credible was based on her demeanor on the stand, a careful analysis of the content of her testimony, and a sensitivity to the specificity of her allegations. As the court explained, "I watched her demeanor. I watched her hold back tears. I watch[ed] how she was looking at the defendant. *** I paid attention to what she was testifying to." And while the trial judge believed D.R., she was clearly mindful of the State's high burden of proof. The trial court dismissed the majority of the 18 charges contained in the indictment. The three instances of abuse for which Mr. Santillan was convicted involved the episodes where D.R.'s testimony was descriptive and specific. Where D.R.'s testimony lacked this specificity, Mr.

Santillan was acquitted.

¶ 89    In contesting the trial court's finding that D.R. was credible, Mr. Santillan makes several arguments. First, he notes that there was no physical evidence to corroborate D.R.'s testimony. We reject this argument. As stated plainly by this court in *People v. Parker*, 2016 IL App (1st) 141597, ¶ 30, in cases involving sexual assault, the absence of physical or medical evidence corroborating a complainant's testimony is not grounds for reversal on appeal.

¶ 90    Mr. Santillan next takes issue with the lack of corroborating eyewitnesses. Referring specifically to D.R.'s recollection that she was sexually assaulted in the family minivan in a Sam's Club parking lot when she was 12 or 13, Mr. Santillan argues that "no witness saw [him] place his mouth on [D.R.'s] vagina (in broad daylight in a public parking lot)." In our view, the lack of eyewitnesses hardly discredits D.R.'s testimony. As the State explains, "[t]o the extent that [Mr. Santillan] complains that 'no witness' saw the assault, *** the evidence was that [Mr. Santillan] assaulted D.R. in the back of a minivan and it is a reasonable inference that [Mr. Santillan] chose that location so he would not be detected abusing D.R."

¶ 91    Mr. Santillan next points out that "there was no evidence that D.R. ever told anyone about this incident before reporting the abuse to the police some five or six years later when she was 18 years old." The implication here is that D.R.'s delayed reporting of the minivan incident suggests fabrication. We reject that inference.

¶ 92    Delayed reporting is a common and well-documented phenomenon among child victims of sexual abuse. See Rosaleen McElvaney, *Disclosure of Child Sexual Abuse: Delays, Non-disclosure, and Partial Disclosure. What the Research Tells Us and Implications for Practice*, CHILD ABUSE REV. (2013). It is particularly common among young victims and certain factors have been found to increase the likelihood that such victims postpone their disclosure, including

penetration and whether the assailant is a "friend, family member, or mentor." Iva A. E. Bicanic, *et al.*, *Predictors of delayed disclosure of rape in female adolescents and young adults*, 6 EUR. J. PSYCHOTRAUMATOLOGY (2015).

¶ 93    As we recognized in *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993), "a delay in reporting incidents of sexual abuse may be reasonable where the victim's silence can be attributed to fear of the offender or to shame, guilt, and embarrassment." "In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry." *Id.* Guided by this case law, and the research on the topic, we do not view D.R.'s delayed reporting as any reason to reject the trial court's credibility finding.

¶ 94    Mr. Santillan challenges the State's comparison of his case to *Duplessis*, arguing in his reply brief:

> "*Duplessis* is not on point because, in *Duplessis*, the delay in reporting was merely three
> weeks for one complainant and four months for the other. In this case D.R. waited until she
> was eighteen years old to report the abuse, approximately nine years after she said the abuse
> began. Because this delay was much loner [*sic*] than a few weeks or months, *Duplessis* is
> not on point."

Through this reading of *Duplessis*, Mr. Santillan invites the court to draw a line regulating at what point a child's delay in reporting sex abuse can be interpreted as impeaching. We reject this invitation. In this case, D.R.'s silence can be reasonably explained by her fear, confusion, and youth. The delay does not undermine the trial judge's credibility determination.

¶ 95    Mr. Santillan's final sufficiency argument is that D.R.'s testimony was contradicted by other witnesses including her mother Margarita, her half-brother Oscar, and her grandmother Epifania. But, here, Mr. Santillan is ignoring the trial court's findings and, in the words of the

State, "rehash[ing] the evidence in the light most favorable to him."

¶ 96   The trial judge found neither Margarita nor Epifania to be credible witnesses. Margarita was evasive and, in the trial judge's words, "basically testified to nothing, that she knows nothing and was never told about anything." Epifania's testimony was "very unclear" and changed substantially over the course of the trial. At the pretrial hearing she said she was unaware of the abuse and suggested that D.R. was lying, then at trial she reversed completely and said that D.R. was telling the truth. In the face of this reversal, the court reasonably concluded that Epifania's testimony "did not present[] any real evidence."

¶ 97   In contrast to Epifania and Margarita, the court found that Oscar testified clearly, but that even assuming everything he said was true, all he really testified to was that he "didn't see anything," which the trial judge reasonably concluded did not necessarily amount to an impeachment of D.R.'s testimony. None of these determinations appear unreasonable to us and, thus, we are not swayed by Mr. Santillan's argument that D.R.'s credibility was "seriously undermined by the other witnesses at trial."

¶ 98   In sum, Mr. Santillan has not shown that the evidence in this case was insufficient to establish his guilt beyond a reasonable doubt.

¶ 99                     B. The Admissibility of D.R.'s Outcry Statement

¶ 100   Mr. Santillan next argues that the trial court erred when it allowed hearsay testimony in the form of D.R.'s outcry statement to her friend Maria Gomez, made when D.R. was 11 years old, in which D.R. told her friend that Mr. Santillan had inappropriately touched her. That statement, Mr. Santillan claims, "made by one child to another, not tied to any specific allegation of abuse, changed in content multiple times during the proceedings and therefore was unreliable and should not have been admitted." While he concedes that his counsel did not properly preserve this issue

for appeal, he urges us to reach it nonetheless under the plain error doctrine.

¶ 101    The first step in any plain error analysis is to determine whether error occurred at all, because "[w]ithout reversible error, there can be no plain error." *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010) (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Mr. Santillan cannot overcome this gateway hurdle.

¶ 102    Section 115-10 of the Code of Criminal Procedure codifies a hearsay exception for out-of-court statements made by children who are alleged to have been sexually abused where "sufficient safeguards of reliability" exist. 725 ILCS 5/115-10(b)(1) (West 2020). As our supreme court explained in *People v. Kitch*, 239 Ill. 2d 452, 467 (2011), "[s]ection 115-10 allows for a child victim's hearsay statement to be admitted under two scenarios: (1) the court deems the statement reliable and the child testifies at trial *** or (2) the child does not testify, the statement is deemed reliable, and the allegations of sexual abuse are independently corroborated." Here, the statement was admitted under the first scenario, as D.R., the declarant, and Maria Gomez, the witness who elicited the outcry statement, were both made available to the defense for cross-examination at trial.

¶ 103    When conducting the "sufficient safeguards of reliability" analysis, "a trial court evaluates the totality of the circumstances surrounding the making of [the] hearsay statements." *People v. West*, 158 Ill. 2d 155, 164 (1994). "Some factors that are important in making the determination include: the child's spontaneous and consistent repetition of the incident, the child's mental state, use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate." *Id.* The trial court's decision to admit evidence under section 115-10 "will not be reversed unless the record clearly demonstrates that the court abused its discretion." *People v. Applewhite¸* 2016 IL App (4th) 140558, ¶ 57. An abuse of discretion occurs where "the trial court's determination is

arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court." *Id.* (quoting *People v. Becker*, 239 Ill. 2d 215, 234 (2010)).

¶ 104   Upon reviewing the record, we are not convinced the trial court abused its discretion in admitting evidence of D.R.'s statement to Maria. At the pretrial hearing where the circumstances surrounding this statement were discussed, the trial court, after hearing arguments from both sides, explained its reasoning as follows:

> "I've heard the testimony of Ms. Gomez, and I find that based on her testimony the fact that she was a young girl, she was a friend with the complainant \*\*\*, the fact that she had an experience with the defendant while she slept over, and then the statements which she testified to me today that [D.R.] told her that the defendant touched her inappropriately, that he touched her private part, those statements, if [D.R.] testifies, Ms. Maria Gomez can testify to those statements. I do find that they're reliable enough based on how she testified and what occurred. This is a friend of [D.R.] that she could rely on. They were 10 or 11, which is of an age that I find it would be appropriate for the complainant to talk about this with a girl her age. So I do find the statements are reliable based on how Ms. Maria Gomez testified. That is my ruling. She will be able to testify if [D.R.] testifies."

¶ 105   Mr. Santillan's claims that the section 115-10 hearing conducted by the trial court was "an exercise in futility" because the court prevented his attempt to impeach Maria Gomez. During the hearing, defense counsel sought to highlight the fact that when Maria first gave a statement to the police in 2015, she did not use the words "inappropriate" or "private parts" or "vagina," rather, she had merely told police that D.R. said that Mr. Santillan "touched her." The lack of more specific language in this statement, defense counsel attempted to argue, was inconsistent with the hearsay statement where more specific language was purportedly used to describe Mr. Santillan's

conduct. When the State objected to this line of questioning, explaining that the document defense counsel referred to was merely a summary of what Maria told officers, the trial court sustained the objection, explaining to Mr. Santillan that the omission was not relevant and that "if I decide that this testimony is admissible at trial, then you can impeach her at trial."

¶ 106 Sustaining this objection was not an abuse of discretion. While the statement defense counsel sought to highlight was indeed less specific than the outcry testimony, it was not inconsistent with it. Further, the omission of some of what Ms. Gomez testified to is explained by the fact that the "statement" defense counsel relied on was not a verbatim transcript, but a summary of a discussion written by a law enforcement official. At trial, when Maria Gomez was subjected to cross-examination and pressed about why her statement to police did not contain the word "vagina," she explained that the summary statement did not capture everything she said during her conversation with police.

¶ 107 In sum, "a trial court has a considerable amount of discretion in determining the admissibility of hearsay statements" (*West*, 158 Ill. 2d at 164), and here, we do not see how that discretion was abused. The trial judge in this case satisfied her obligations under the rules of evidence to determine the reliability of the outcry statement and her decision to admit it was certainly not reversible error.

¶ 108                          C. Specificity of the Indictment at to Counts 3 and 7

¶ 109 Mr. Santillan's final argument is that his convictions for two counts of aggravated criminal sexual abuse should be reversed because the charging instrument, which alleged that those offenses were committed continuously over a period of six years, was unconstitutionally overbroad, lacking the specificity necessary for him to mount a meaningful defense and thus violating his due process rights. Alternatively, Mr. Santillan argues that his trial counsel was ineffective for failing to

challenge the overbroad indictment or request a bill of particulars. We address these arguments in turn.

¶ 110                              1. Sufficiency of the Indictment

¶ 111    When, as here, the sufficiency of a charging document is attacked for the first time posttrial, the relevant inquiry is whether the document "notified the defendant of the precise offense charged with enough specificity to allow the defendant to (1) prepare his or her defense and (2) plead a resulting conviction as a bar to future prosecution arising out of the same conduct." *People v. Carey*, 2018 IL 121371, ¶ 22. "In other words, the appellate court should consider whether the defect in the information or indictment prejudiced the defendant in preparing his defense." *Id.* (quoting *People v. Thingvold*, 145 Ill. 2d 441, 448 (1991)). In making this determination, we consider the record and the indictment as a whole. *Id.* If we "cannot say that the charging instrument error inhibited the defendant in the preparation of his or her defense, then the court cannot conclude that the defendant suffered any prejudice." *Id.*

¶ 112    The prosecution is given particular latitude in sex abuse cases involving children where— while the indictment must give "some indication" as to when the offenses occurred—the precise date of the offense is not considered to be an essential factor. *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005). A degree of flexibility is thus tolerated in such cases, and "as long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Id.*

¶ 113    Here, the State satisfied these basic pleading requirements, alleging in the indictment that "on or about August 22, 2005[,] and continuing on through August 21, 2011," Mr. Santillan committed the offense of aggravated criminal sexual abuse by touching his hand (count 3) and

mouth (count 7) to D.R.'s breast for the purpose of sexual gratification or arousal when D.R., a family member who had resided with Mr. Santillan for at least one year, was under the age of 18.

¶ 114   Relying almost entirely on an old and now superseded New York case, *People v. Keindl*, 502 N.Y. 2d 410 (1986), Mr. Santillan argues that "[b]ecause of the over broad nature of the charges in Counts 3 and 7," and the "unreasonably long period of six years," he was deprived of the opportunity to defend himself with "anything other than the most general and ineffective denials of wrongdoing." For its part, the State contends that "in light of the victim's youth and the fact that the acts occurred multiple times over a period of six years, the dates provided in the indictment were as definite as possible." In our view, Mr. Santillan's reliance on *Keindl* is wholly misplaced and the State is correct that this indictment is sufficient.

¶ 115   As we stated in *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 24, another case where a defendant convicted of sex crimes invoked *Keindl*, "we are not bound to follow the decisions of courts of last resorts in other states, particularly where those decisions involve interpretations of those states' own constitutions and statutes." While we can (and sometimes should) look to foreign cases as persuasive authority, any reason to be influenced by *Keindl* is undermined by the fact that it is no longer good law, even in the state of New York. See *People v. Pabon*, 28 N.Y. 3d 147, 154 (2016).

¶ 116   As the New York Court of Appeals explained in *Pabon*, the holding in *Keindl* permitted an unfortunate situation in which "claims of continued abuse went unprosecuted because child victims often could not remember the dates when the sexual assaults had occurred or how many times they were assaulted in that same period of time." *Id.* To address this problem and respond to the well-documented "reality that child victims are less capable of providing specific detail as to the dates and times of each sexual assault committed over an extended period of time," the New

York legislature stepped in, passing a new law which defined "continuing crimes" in a way that effectively superseded the *Keindl* decision. *Id.*

¶ 117 In addition, Mr. Santillan's case presents different facts than those before the court in *Keindl*. First, the defendant in that case filed a pretrial motion to quash the indictment, which was never filed here. Also, the court in *Keindl* was primarily concerned with "multiplicity of acts encompassed in single counts" whereas, here, Mr. Santillan challenges two counts of aggravated criminal sexual abuse, each alleging a discrete, and distinctive act of forbidden contact between himself and D.R., albeit over a lengthy time period. As noted above, it is permissible and often necessary to allege a lengthy time period in a child sex abuse case, particularly where, as here, the alleged perpetrator lives in the same household as the victim. Accordingly, we do not view *Keindl* as persuasive in this case and conclude that the indictment challenged by Mr. Santillan was not unreasonably or unconstitutionally overbroad.

¶ 118                    2. Ineffective Assistance of Counsel

¶ 119 Mr. Santillan, invoking *Strickland v. Washington*, 466 U.S. 668 (1984), argues in the alternative that his trial counsel's failure to object to the vague indictment or request a bill of particulars deprived him of effective assistance of counsel.

¶ 120 Under *Strickland*, "[a] defendant is denied effective assistance where his counsel's performance fell below an objective standard of reasonableness, and absent counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different." *Albarran*, 2018 IL App (1st) 151508, ¶ 35. "When evaluating a claim of ineffective assistance of counsel, we may address the issue of whether defendant suffered any prejudice from his trial counsel's allegedly deficient performance without first concluding that trial counsel's counsel performance fell below an objectively reasonable standard." *Id.* "To show prejudice, a

defendant must establish a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." *Id.* "A probability rises to the level of a 'reasonable probability' when it is sufficient to undermine confidence in the outcome or the proceeding." *Id.* Here, Mr. Santillan is unable to carry his burden of demonstrating prejudice by his counsel's failure to object to the indictment or move for a bill of particulars.

¶ 121    Mr. Santillan is correct that, if his counsel had objected to the indictment prior to trial, he would not have been required to show that the vagueness prejudiced his defense but only that the indictment failed to meet the pleading requirements of section 111-3(a). 725 ILCS 5/111-3(a) (West 2018). However, as noted above, those requirements are relaxed in a case involving child sexual abuse. As we explained in *Guerrero*, in cases involving child sex abuse, "as long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Guerrero*, 356 Ill. App. 3d at 27.

¶ 122    Here, the prosecution satisfied this basic pleading requirement. Thus, even if Mr. Santillan's trial counsel had objected to the indictment for its vagueness, we find it unlikely that the trial court would have dismissed the charges against him. Instead, the State would have simply argued (as it did in the appellee's brief) that "in light of the victim's youth and the fact that the acts occurred multiple times over a period of six years, the dates provided in the indictment were as definite as possible."

¶ 123    Nor are we persuaded that Mr. Santillan was prejudiced by his counsel's failure to request a bill of particulars. Had his counsel done this, Mr. Santillan explains, "the State would have been compelled to narrow the broad time span in the charges to afford [Mr.] Santillan the opportunity to advance a meaningful defense." Mr. Santillan further argues that "[h]ad the State narrowed its

charges, [he] could possibly have provided at least a partial alibi defense or shown that someone else, perhaps another family member, may have been responsible for the abuse." The State responds that a bill of particulars would have only required the State to provide the best information that it had, and that, given the nature of the conduct and the age of the victim, it satisfied that obligation. We agree.

¶ 124   While the time frame in the indictment was indeed broad, this was reasonable considering the age of the victim, the content of her testimony, and the type of serial abuse alleged. We are simply not persuaded that had Mr. Santillan's defense attorney moved for a bill of particulars, the outcome of this trial would have likely been different. Thus, Mr. Santillan cannot show prejudice.

¶ 125                                    IV. CONCLUSION

¶ 126   For all of the above reasons, we affirm Mr. Santillan's convictions.

¶ 127   Affirmed.